# NO. 12-22-00277-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN THE INTEREST OF* | § | *APPEAL FROM THE 369TH* |
| *A.M., A.C. & C.C.,* | § | *JUDICIAL DISTRICT COURT* |
| *CHILDREN* | § | *ANDERSON COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

S.C. and J.C. appeal the termination of their parental rights. J.C. presents one issue on appeal, and S.C. presents ten issues.[1] We affirm.

## BACKGROUND

J.C. is the father of A.C. and C.C., and S.C. is the mother of A.C., A.M., and C.C.[2] On August 21, 2020, the Department of Family and Protective Services (the Department) filed an original petition for protection of a child, for conservatorship, and for termination in suit affecting the parent-child relationship. The Department was appointed temporary managing conservator of the children, and the parents were allowed limited access to the children.

At the conclusion of the trial on the merits, the jury found, by clear and convincing evidence, that the parent-child relationship between J.C. and the children and S.C. and the children should be terminated. Consequently, the trial court found that J.C. and S.C. both engaged in one or more of the acts or omissions necessary to support termination of their parental rights under subsections (D) and (E) of Texas Family Code Section 161.001(b)(1). The trial court also found that termination of the parent-child relationship between J.C. and the

---

[1] S.C. lists her issues in two different sections of her brief. We construe her brief as raising ten issues.

[2] The parties entered a Rule 11 agreement concerning A.M., which named the Department as A.M.'s permanent managing conservator and S.C. as a possessory conservator. The jury was waived as to A.M., and the trial court adopted the Rule 11 agreement in its order. The parties do not appeal with regard to A.M.

children and S.C. and the children is in the children's best interest. Based on these findings, the trial court ordered that the parent-child relationship between J.C., A.C., and C.C. be terminated. The trial court likewise ordered that the parent-child relationship between S.C., A.C., and C.C. be terminated. This appeal followed.

<u>**JURISDICTION**</u>

In her fifth issue, S.C. asserts the trial court's jurisdiction expired before trial commenced, rendering the trial court's subsequent order of termination void.

**<u>Standard of Review and Applicable Law</u>**

Whether a trial court possesses subject matter jurisdiction is a question of law that we review de novo. ***Tex. Dep't of Parks & Wildlife v. Miranda***, 133 S.W.3d 217, 226 (Tex. 2004); ***In re X.A.F.***, No. 07-19-00443-CV, 2020 WL 2896533, at *1 (Tex. App.—Amarillo June 1, 2020, no pet.) (mem. op.); ***In re T.B.***, 497 S.W.3d 640, 644 (Tex. App.—Fort Worth 2016, pet. denied). Section 263.401(a) of the Texas Family Code, states as follows:

> Unless the court has commenced the trial on the merits or granted an extension under Subsection (b) or (b-1), on the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator, the court's jurisdiction over the suit affecting the parent-child relationship filed by the department that requests termination of the parent-child relationship or requests that the department be named conservator of the child is terminated and the suit is automatically dismissed without a court order. Not later than the 60[th] day before the day the suit is automatically dismissed, the court shall notify all parties to the suit of the automatic dismissal date.

TEX. FAM. CODE ANN. § 263.401(a) (West Supp. 2022). In other words, a trial court automatically loses jurisdiction over a termination of parental rights case if the court does not commence a trial on the merits or grant an extension by the dismissal deadline. ***In re Z.S.***, 631 S.W.3d 313, 316 (Tex. App.—Houston [14th Dist.] 2020, no pet.). If the trial court fails to commence trial on time, the court's jurisdiction over the suit is terminated, and the suit is automatically dismissed without a court order. TEX. FAM. CODE ANN. § 263.401(a); ***In re G.X.H.***, 627 S.W.3d 288, 292 (Tex. 2021). Additionally, Subsection 263.401(b) provides that the trial court may not retain the suit on its docket after the time described in Subsection 263.401(a) unless the court finds that (1) extraordinary circumstances necessitate the child remaining in the temporary conservatorship of the Department, and (2) continuing the Department's appointment as temporary managing conservator is in the children's best interest. TEX. FAM. CODE ANN.

2

§ 263.401(b). If the trial court makes the required findings, it may retain the suit on its docket for not more than 180 days after the time set forth in Subsection 263.401(a). Furthermore, if a trial court grants a motion for new trial, the new trial must be commenced within 180 days of the date the motion for new trial is granted. *Id*. § 263.401(b-1)(1).

**Analysis**

Here, the trial court named the Department temporary managing conservator of the children on August 21, 2020. Therefore, the initial dismissal date was Monday, August 23, 2021. *See id.* § 263.401(a). On August 16, 2021, the trial court issued an order retaining the suit on its docket and setting February 14, 2022, as the new dismissal date and January 17, 2022, as the new trial date. The trial court held jury selection on January 18 and trial occurred February 7 through 11 and 14 through 15. The jury found in favor of termination.

On March 25, S.C. and J.C. filed a motion for new trial, alleging in part they were denied their right to appointed counsel. Following a hearing on May 31, the trial court granted the motion for new trial and set the case for jury selection on August 8. The written order granting the motion for new trial does not include a new trial date. The trial court's docket sheet includes a notation that it granted the motion for new trial and set trial for August 8. And a May 31 order appointing S.C.'s attorney also indicates an August 8 trial date. None of the trial court's orders set a dismissal date. S.C. urges "there was no order extending the case, retaining the suit on the docket, or setting a new dismissal date before the new trial court was granted" and that "the trial court abused its discretion." She contends that the trial court's failure to set a new dismissal date within the time prescribed by statute constitutes error.

However, any alleged defects regarding the timing and form of the order resetting the dismissal date are not jurisdictional. *See **G.X.H.***, 627 S.W.3d at 301 (claimed defects relating to trial court's compliance with requirements in subsection (b) are not jurisdictional and must be preserved for appeal); *see also,* ***In re P.Z.F.***, 651 S.W.3d 147, 153 (Tex. App.—Dallas 2021, pet. denied) (noting **G.H.X.** holding that "claimed defects relating to the other requirements of 263.401(b) are not [jurisdictional]" and concluding complaints that trial court failed to make findings described in subsection (b) were not raised in trial court and, thus, were not preserved for appeal); ***M. P. v. Tex. Dep't of Fam. & Protective Servs.***, No. 03-22-00163-CV, 2022 WL 4281617, at *5 (Tex. App.—Austin Sept. 16, 2022, pet. filed) (mem. op.) (applying **G.X.H.** and concluding Mother did not preserve jurisdictional argument for review because she did not raise

complaint about lack of best interest finding until after initial dismissal date passed); *In re P.R.*, No. 10-22-00062-CV, 2022 WL 3655402, at *3 (Tex. App.—Waco Aug. 24, 2022, pet. denied) (mem. op.) ("any complaint regarding the failure of the trial court to make an express finding of extraordinary circumstances was not preserved for appellate review"); *In re J.F.*, No. 07-22-00058-CV, 2022 WL 3328274, at *3 (Tex. App.—Amarillo Aug. 11, 2022, no pet.) (mem. op.) ("While a trial court's failure to timely extend the automatic dismissal date before that date passes is jurisdictional, claimed defects relating to the other requirements of subsection 263.401(b) are not"); *In re R.J.R.*, No. 04-21-00246-CV, 2021 WL 5813827, at *3 (Tex. App.—San Antonio Dec. 8, 2021, pet. denied) (mem. op.) (complaint that trial court failed to make Section 263.401(b) findings was not preserved because appellant did not raise issue in the trial court). As a result, any error in the trial court's failure to set a specific dismissal date did not divest the trial court of jurisdiction.[3] We overrule S.C.'s fifth issue.

**TERMINATION OF PARENTAL RIGHTS**

In J.C.'s sole issue and S.C.'s ninth issue, they urge the evidence is legally and factually insufficient to terminate their parental rights pursuant to subsections (D) and (E) of Texas Family Code Section 161.001(b)(1).

**Standard of Review**

When confronted with both a legal and factual sufficiency challenge, an appellate court must first review the legal sufficiency of the evidence. *Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981); *In re M.D.S.*, 1 S.W.3d 190, 197 (Tex. App.—Amarillo 1999, no pet.). In conducting a legal sufficiency review, we must look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its findings were true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the fact finder settled disputed facts in favor of its finding if a reasonable fact finder could do so and disregard all evidence that a reasonable fact finder could have disbelieved or found incredible. *Id*.

The appropriate standard for reviewing a factual sufficiency challenge to the termination findings is whether the evidence is such that a fact finder could reasonably form a firm belief or

---

[3] We also note that S.C. asked the trial court to grant her a new trial. As a result, she is estopped from challenging the trial court's ruling under the invited error doctrine. *See In re S.T.*, 508 S.W.3d 482, 488 (Tex. App.—Fort Worth 2015, no pet.).

conviction about the truth of the petitioner's allegations. ***In re C.H.***, 89 S.W.3d 17, 25 (Tex. 2002). In determining whether the fact finder has met this standard, an appellate court considers all the evidence in the record, both that in support of and contrary to the trial court's findings. ***Id***. at 27-29. Further, an appellate court should consider whether disputed evidence is such that a reasonable fact finder could not have reconciled that disputed evidence in favor of its finding. ***In re J.F.C.***, 96 S.W.3d at 266. The trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. ***Nordstrom v. Nordstrom***, 965 S.W.2d 575, 580 (Tex. App.—Houston [1st Dist.] 1997, pet. denied).

## Applicable Law

Involuntary termination of parental rights embodies fundamental constitutional rights. ***Vela v. Marywood***, 17 S.W.3d 750, 759 (Tex. App.–Austin 2000), *pet. denied per curiam*, 53 S.W.3d 684 (Tex. 2001); ***In re J.J.***, 911 S.W.2d 437, 439 (Tex. App.—Texarkana 1995, writ denied). Because a termination action "permanently sunders" the bonds between a parent and child, the proceedings must be strictly scrutinized. ***Wiley v. Spratlan***, 543 S.W.2d 349, 352 (Tex. 1976); ***In re Shaw***, 966 S.W.2d 174, 179 (Tex. App.—El Paso 1998, no pet.).

Section 161.001 of the Family Code permits a court to order termination of parental rights if two elements are established. TEX. FAM. CODE ANN. § 161.001 (West 2022); ***In re J.M.T.***, 39 S.W.3d 234, 237 (Tex. App.—Waco 1999, no pet.). First, the parent must have engaged in any one of the acts or omissions itemized in the second subsection of the statute. TEX. FAM. CODE ANN. § 161.001(b)(1); ***Green v. Tex. Dep't of Protective & Regulatory Servs.***, 25 S.W.3d 213, 219 (Tex. App.—El Paso 2000, no pet.); ***In re J.M.T.***, 39 S.W.3d at 237. Second, termination must be in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(2); ***In re J.M.T.***, 39 S.W.3d at 237. Both elements must be established by clear and convincing evidence, and proof of one element does not alleviate the petitioner's burden of proving the other. TEX. FAM. CODE ANN. § 161.001; ***Wiley***, 543 S.W.2d at 351; ***In re J.M.T.***, 39 S.W.3d at 237.

The clear and convincing standard for termination of parental rights is both constitutionally and statutorily mandated. TEX. FAM. CODE ANN. § 161.001; ***In re J.J.***, 911 S.W.2d at 439. Clear and convincing evidence means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2019). The burden of proof is upon the party seeking the deprivation of parental rights. ***In re J.M.T.***, 39 S.W.3d at 240.

**Subsections (D) and (E)**

The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child. TEX. FAM. CODE ANN. § 161.001(b)(1)(D). Subsection (D) addresses the child's surroundings and environment. *In re N.R.*, 101 S.W.3d 771, 775-76 (Tex. App.—Texarkana 2003, no pet.). The child's "environment" refers to the suitability of the child's living conditions as well as the conduct of parents or others in the home. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). The relevant time frame to determine whether there is clear and convincing evidence of endangerment is before the child was removed. *Ybarra v. Tex. Dep't of Human Servs.*, 869 S.W.2d 574, 577 (Tex. App.—Corpus Christi 1993, no pet.). Further, subsection (D) permits termination based on a single act or omission. *In re R.D.*, 955 S.W.2d 364, 367 (Tex. App.—San Antonio 1997, pet. denied).

The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent engaged in conduct, or knowingly placed the child with persons who engaged in conduct, that endangers the physical or emotional well-being of the child. TEX. FAM. CODE ANN. § 161.001(b)(1)(E). "Endanger" means to expose to loss or injury or to jeopardize. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). It is not necessary that the conduct be directed at the child or that the child actually suffers injury. *Boyd*, 727 S.W.2d at 533. Termination under subsection (E) must be based on more than a single act or omission. *In re D.T.*, 34 S.W.3d 625, 634 (Tex. App.—Fort Worth 2000, pet. denied). Subsection (E) requires us to look at the parent's conduct alone, including actions, omissions, or the parent's failure to act. *In re D.J.*, 100 S.W.3d 658, 662 (Tex. App.—Dallas 2003, pet. denied). Scienter is not required for an appellant's own acts under Section 161.001(b)(1)(E), although it is required when a parent places the child with others who engage in endangering acts. *In re U.P.*, 105 S.W.3d 222, 236 (Tex. App.—Houston [14th Dist.] 2003, pet. denied), *overruled on other grounds*, *In re L.C.L.*, 599 S.W.3d 79, 85-86 (Tex. App.—Houston [14th Dist.] 2020, pet. denied).

Generally, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of the child. *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). Though imprisonment of a parent is insufficient, standing

alone, to constitute "engaging in conduct which endangers the emotional or physical well-being of the child," it is a factor to consider on the issue of endangerment. *See Boyd*, 727 S.W.2d at 533-35. Because it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under subsection (E). *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617-18 (Tex. App—Houston [1st Dist.] 2009, pet. denied).

**The Evidence**

Investigator Felicia Hickerson testified that the Department received an intake in 2018, which alleged that the parents were arguing in the home and law enforcement found drugs in the home when they responded to the disturbance. Law enforcement arrested J.C. According to Hickerson, four children were involved at the time: N.W.,[4] A.C., A.M., and C.C. Hickerson stated S.C. tested positive for methamphetamine on an instant drug test, but denied using. Hickerson testified that the maternal grandmother was present and likewise tested positive on a drug test. She stated law enforcement had to be called to prevent S.C. from leaving with the children. The following day, S.C. tested positive for methamphetamine on a urinalysis and hair follicle drug test and J.C. tested positive for methamphetamine on an oral swab drug test. J.C. admitted to using methamphetamine but claimed S.C. did not know about the drugs in the home or his drug use. Hickerson testified A.M., A.C., and C.C. each tested positive for methamphetamine.

J.C. admitted using methamphetamine when the case began and using methamphetamine on the property but denied using it "inside the dwelling." He admitted to smoking methamphetamine "with the little glass thing." J.C. denied that the methamphetamine and pipes found in his bedroom belonged to him or S.C. and claimed they belonged to someone else; however, he denied that someone else used methamphetamine in the home. Instead, he claimed someone kept methamphetamine and pipes in his house without his knowledge, admitted this person had been around the children, and claimed he later discovered the person was selling methamphetamine. When asked to confirm that he admitted to an officer that he owned the pipes, J.C. replied: "That's hearsay." J.C. admitted being arrested and incarcerated for "right under 90 days" but was not convicted. J.C. further admitted the children tested positive for methamphetamine, "[p]robably" due to him and S.C. using the drug and the children being

_____

[4] N.W. turned eighteen roughly five months into the 2020 case.

contaminated. J.C. acknowledged this was an unsafe environment for the children and he was not a fit parent.

S.C. admitted she and J.C. both used methamphetamine in 2018, drugs were found in the home, and the children tested positive. She claimed to use drugs outside the home and when the children were with J.C., his adult daughter, or the maternal grandmother. Although S.C. admitted the maternal grandmother tested positive for methamphetamine, she denied that the grandmother used methamphetamine. S.C. stated N.W., her oldest daughter, also babysat "once or twice" while S.C. used methamphetamine in a detached laundry room on the property.

S.C. acknowledged she continued to test positive in the beginning of the 2018 case, but she and J.C. worked services and the children were returned to them. She completed parenting classes, mental health counseling, an assessment with East Texas Council on Alcohol and Drug Abuse (ETCADA), attended twice weekly drug counseling, participated in individual and group counseling at the women's crisis center, and tested negative. The children were returned to S.C. in a monitored return in Summer 2019.

J.C. admitted testing positive right before the monitored return. He denied relapsing and claimed his medication caused a positive test. He later admitted that he "[p]resumably" relapsed. On July 1, 2019, he went to rehab in Austin for two weeks and went to a dual treatment center in Georgia for "[a]lmost a month." S.C. admitted "[t]here was talk" of divorcing J.C. if he failed to do what he was supposed to do. However, she felt J.C. changed, she never filed for divorce, and she never intended to file for divorce.

Investigator Shawna Dupree became involved about six months after the children's return to S.C. and J.C. She stated that around July 27, 2020, it was alleged that J.C. and S.C. were using drugs, S.C. lost a lot of weight and had dark teeth, A.C. and C.C. slept until three or four o'clock in the afternoon, and there were concerns S.C. and J.C. were manufacturing methamphetamine. Dupree went to S.C.'s and J.C.'s home with law enforcement and observed chemicals and hoses present, which the officer noted were "components of making meth." Dupree confirmed there was no evidence of "cooking meth" and methamphetamine was not found in the home.

When Dupree attempted to remove the children, J.C. and S.C. refused to cooperate and law enforcement had to prevent them from leaving. Once the children were in Dupree's vehicle, N.W. stated, "I knew they were doing it. … I asked them point blank, and they lied to me." N.W. further stated she did not want to be like S.C. and J.C. Dupree recalled that A.M. agreed with

8

N.W. and said that he knew "they were doing it when [S.C.] started losing weight and staying up all night."

Dupree stated S.C. was willing to cooperate but J.C. refused. As a result, S.C. and J.C. were court-ordered to participate in services on August 13, 2020. On August 14, S.C., J.C., and C.C. each tested positive for methamphetamine. Dupree stated S.C. and J.C. denied using and claimed C.C. tested positive due to spending time with the grandmother, who smoked methamphetamine. Quest Diagnostics lab manager Shane Morris testified that C.C.'s head hair sample provided "roughly 90 days' worth of use." He could not identify a time period of use from J.C.'s arm hair sample.

J.C. claimed S.C.'s and C.C.'s positive tests resulted from contamination by a random third party or from his medication because he sweated. He believed his test was inconclusive due to a lack of definite time period. J.C. denied that the testing facility had to take hair from his arm because he shaved his head. But he admitted shaving his head, allegedly because of lice in the home. However, the children's heads were not shaved. J.C. acknowledged that shaving one's head is a method for avoiding a drug test but that he shaved his head "way before" the Department came to his house. Although J.C. did not agree with the test results, he did not go to any other testing facilities because they used the same lab. When asked to clarify whether he had a problem with the collection facility or the lab, he stated he did not "want to go where any of the CPS has been before." While J.C. agreed paranoia is a side effect of methamphetamine use, he denied being paranoid.

S.C. testified she did nothing to justify having the children removed in 2020. She acknowledged that she, J.C., and C.C. tested positive on hair follicle tests but denied using drugs and claimed their urinalyses were negative. J.C. also denied any responsibility for the removal.

Char Williams, CASA volunteer since 2018, testified she believed S.C. and J.C. were using drugs again in 2020. S.C. admitted having a drug problem in 2018 but denied using any drugs since then. S.C. did not dispute any of her positive drug tests from 2018 through 2019. She admitted testing positive for amphetamine and methamphetamine on August 14, 2020, but disagreed with the results. S.C. stated that she tested negative on a self-administered hair follicle test on October 7, 2020. She admitted being ordered to submit to drug tests prior to October and being asked to drug test regularly. But she chose not to drug test for the Department and, instead, "chose to pursue" her own testing. S.C. admitted failing to submit to the Department's court-

ordered drug test on May 31, 2022, but claimed she paid for her own. She also admitted failing to submit to the court-ordered drug test on June 23, 2022, despite the ability to choose from several testing sites.

S.C. claimed involvement in AA/NA. But she had not attended AA/NA for a month or more and did not recall the last time she attended. S.C. further claimed involvement in an online sobriety group but had not participated in "a while." Although she "used to talk quite a bit" with her sister, an AA sponsor, S.C.'s sister was not her sponsor.

When asked whether using drugs around or while raising her children constituted a form of abuse or neglect, S.C. stated: "I would absolutely agree that anyone who uses drugs around kids and whatnot is not -- you know, that's not the best thing to do around your kids, you know. It's not -- it's not okay." She further stated she would no longer tolerate drug use around the children, as drugs were part of her past. When asked whether it was in the children's best interest to be in a home where the parents used methamphetamine, she stated: "[I]t's never a good idea to put children in a home where any drugs are present, not even marijuana." S.C. agreed using drugs while raising children was not good parenting, "[e]specially not if the drugs impair you to the point where you can't care for your children."

At the time of trial, J.C. denied he and S.C. were using drugs. J.C. admitted having a problem with methamphetamine for three months before the 2018 case began but claimed he did not use "every single day." Although he "might have tried it or something" a long time ago, he did not have an issue with drugs prior to 2018. J.C. claimed he had not used drugs since his release from rehab in 2019 and blamed his August 2020 positive drug test on his medication. When asked if he provided his prescriptions to the medical review officer, J.C. offered various explanations from the review officer did not return his call, he was told to call the Department, Dupree told him it was not necessary, and he provided his list of medications to the Department.

J.C. represented taking fifteen drug tests since August 2020 but admitted he may not have gone to the facility identified by the Department. He claimed that he and S.C. tested negative on every self-administered test. He admitted failing to submit to the June 23, 2022, court-ordered drug test, stating that "[t]he Judge didn't have jurisdiction over the case" and had no right to order him to drug test. He later stated: "Why would we take a drug test? That's just…entrapment."

J.C. claimed he attended AA/NA "[a]t least 100 times" between 2020 and 2022 and completed the 12 steps at his treatment center "last year". But he could not identify the program's first or second steps. He had not physically attended AA/NA in "a long time" but claimed to attend online three weeks prior. He could not identify the name of the online group. Nor did he have a sponsor.

On November 6, 2021, S.C. and J.C. took A.C. and C.C. from their paternal aunt in a parking lot, threatened the aunt, and refused to return the children. The paternal aunt reported J.C. threatened to "blow away" the judge, attorneys, and caseworker. The paternal grandmother reported being threatened by J.C. J.C. was located at his residence and stated that S.C. fled with the children and he told her to do what she needed to keep them. He refused to provide their location. After an extensive search by the Department, police department, and sheriff's office, S.C. and the children were located at an RV park. S.C. claimed she and J.C. took the children because they were being abused in the paternal aunt's care. Law enforcement noted S.C. appeared disoriented and spoke rapidly.

S.C. and J.C. were arrested on July 1, 2022, in Montgomery County for felony possession of a controlled substance. A traffic stop was conducted on suspicion of fake temporary license plates; J.C. was driving, with S.C. as a passenger. J.C. had several active warrants and was noted to be armed and dangerous. The vehicle was towed, as the VIN on the plates and the vehicle did not match, the vehicle had no insurance or registration, and J.C. had no valid driver's license. An inventory of the vehicle revealed torch lighters, butane bottles, a glass bong, two glass pipes commonly used to smoke methamphetamine and which contained a burnt crystal-like residue consistent with narcotics, and 4.8 grams of methamphetamine. The report reflected S.C. behaved erratically, "rambled on," and claimed she was set up by a friend, while J.C. denied knowledge of the methamphetamine and claimed a friend placed it in the vehicle. Officers noted S.C.'s and J.C.'s stories seemed rehearsed. Officers believed S.C. and J.C. were both using narcotics and knew the drugs were in the vehicle.

S.C. admitted she and J.C. were arrested for possession of a controlled substance but invoked her Fifth Amendment right in response to further questioning about the incident. J.C. admitted the vehicle had two sets of temporary plates. He first denied knowing whether the vehicle was registered, but then admitted it was not. He also claimed to have a driver's license. J.C. admitted there was no insurance on the vehicle but claimed it was insured at the time of trial,

11

despite its remaining impounded. He also acknowledged that officers found drug paraphernalia in the vehicle. When asked whether he was arrested for possession of methamphetamine in July 2022, he asserted the Fifth Amendment.

S.C. testified they lived in a house on Sheridan when the 2018 investigation opened but were in the process of moving to a house on Royall. She stated they spent "maybe one night" at the house on Royall. After the children's removal in 2018, she stayed with her sister in Montgomery County for about three months while J.C. was incarcerated for "[c]hild abuse or whatever." S.C. subsequently agreed J.C. was incarcerated for endangering a child. After J.C.'s release from jail, he and S.C. rented a cabin at the Bar S Ranch in Elkhart where they stayed for about three months before moving to a new home on Hamilton in March 2019. After he returned from drug treatment in August 2019, J.C. moved back to the Bar S Ranch by himself before being allowed to move back in with S.C. S.C. and J.C. lived at the Hamilton address when the 2018 case was closed in December 2019 or January 2020 and when the July 2020 case was opened.

S.C. testified that after the 2020 removal and "[t]he landlord got wind of the CPS case and the meth lab," they were formally evicted and moved to a County Road address. But they had to leave the County Road residence because someone reported to the Social Security Administration that J.C. was using and dealing drugs, "and got his check stopped." On April 13, 2022, J.C. reported to police that he was homeless. J.C. denied claiming to be homeless. S.C. stated they lived in her mother's RV for about a month before moving to Debard Street shortly before trial. She testified that the Debard home was a two-bedroom, one-bath home, in which they intended to stay long-term. However, J.C. testified he did not intend to stay because he wanted something "more stable." He claimed to be in the process of buying land and planned to build a home himself.

S.C. testified that the vehicle they had earlier in the case was stolen and she and J.C. sold their truck. S.C. and J.C. claimed they had transportation but acknowledged the vehicle they were driving when arrested in Montgomery County remained impounded.

S.C. worked as a server at El Toro and at a call center but quit working in early 2020. She then worked for TeleTech Services for about three months but quit in January 2021. She had not been employed since that time. J.C. testified he and S.C. were not employed but he received $1500 monthly in disability income. J.C. claimed he and S.C. sent thousands of dollars to the

maternal aunt to help with the children. When asked where he got the money, he testified he "had a settlement before due to an injury." In response to whether he and S.C. sold drugs to make money, J.C. stated: "Do you? I mean, why would you ask me that?"

**Analysis**

The jury could have considered and given great weight to the evidence of J.C.'s and S.C.'s pattern of irresponsible choices such as ongoing instability, drug use, failure to drug test, and being arrested. *See **In re J.O.A.**, 283 S.W.3d at 336, 346 (Tex. 2009); **In re S.I.H.**, No. 02-11-00489-CV, 2012 WL 858643, at *5 (Tex. App.—Fort Worth Mar. 15, 2012, no pet.) (mem. op.). In addition, the jury was permitted to find that J.C.'s and S.C.'s conduct would subject the children to a life of uncertainty and instability, which endangers their physical and emotional well-being. *See **In Interest of A.R.O.**, 556 S.W.3d 903, 911-12 (Tex. App.—El Paso 2018, no pet.). Finally, the trial court could have considered the evidence of J.C.'s and S.C.'s drug use to support an endangerment finding. *See **In re S.D.**, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).

After reviewing the evidence in the light most favorable to the judgment, we hold that a reasonable factfinder could have formed a firm belief or conviction that S.C. and J.C. knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being and that they engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E). Therefore, we hold that the evidence is legally and factually sufficient to support termination of J.C.'s and S.C.'s parental rights under subsections (D) and (E) of Texas Family Code Section 161.001(b). Accordingly, we overrule S.C.'s ninth issue and J.C.'s sole issue.

### BEST INTEREST

In her tenth issue, S.C. urges the evidence is factually insufficient to support a finding that termination of her parental rights is in the children's best interest.

**Applicable Law**

In determining the best interest of the child, a number of factors have been considered, including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the

13

parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

The family code also provides a list of factors that we will consider in conjunction with the above-mentioned *Holley* factors. *See* TEX. FAM. CODE ANN. § 263.307(b) (West 2019). These include (1) the child's age and physical and mental vulnerabilities; (2) the magnitude, frequency, and circumstances of the harm to the child; (3) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (4) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (5) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (6) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (7) whether the child's family demonstrates adequate parenting skills; and (8) whether an adequate social support system consisting of an extended family and friends is available to the child. *See id.* §263.307(b)(1), (3), (6), (8), (10), (11), (12), (13).

The evidence need not prove all statutory or *Holley* factors in order to show that termination of parental rights is in a child's best interest. *See Holley*, 544 S.W.2d at 372; *In re J.I.T.P.*, 99 S.W.3d 841, 848 (Tex. App.–Houston [14th Dist.] 2003, no pet.). In other words, the best interest of the child does not require proof of any unique set of factors nor limit proof to any specific factors. *In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.). Undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the child's best interest. *In re M.R.J.M.*, 280 S.W.3d 494, 507 (Tex. App.—Fort Worth 2009, no pet.). But the presence of scant evidence relevant to each factor will not support such a finding. *Id.* Evidence supporting termination of parental rights is also probative in determining whether termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d at 28-29. We apply the statutory and *Holley* factors below.

**Analysis**

At the time of trial, A.C. and C.C. were ages eleven and nine years old, respectively. When asked if the children said where they wanted to live, Department investigator Damond Dannaldson stated that while the children love S.C., they were happy and thriving in their placement. He testified that although A.C. "at one point" expressed a desire to return to S.C., at their age, the children were not capable of making that decision. Lee Brown, a Court Appointed Special Advocate (CASA) caseworker, testified the children were "very vulnerable" and smart, but "they love [S.C. and J.C.] and can be influenced by them." Notably, when Department investigator Latoya Higgins was asked if the children wanted to return to S.C., she stated the children never spoke to her about S.C. and the children's foster parent testified C.C. did not "seem to be sad about" being removed from S.C.

As discussed above, the evidence reflects that S.C. endangered the children by causing them to test positive for methamphetamine and subjecting them to her own drug use, incarceration, and instability. Hickerson stated that the drug use in the home and the children testing positive for methamphetamine significantly impaired the children's physical health or emotional development and endangered their physical or emotional welfare. Furthermore, S.C. admitted she exposed the children to drug use and further admitted it was "never a good idea to put children in a home where any drugs are present." Similarly, Brown related, "A parent that tests positive for meth cannot be the best parent for that child."

The evidence at trial showed that the children were doing very well and thriving with their foster parent, who met their emotional and physical needs, provided stability, had good parenting abilities, and facilitated sibling contact. The children are involved in church and extracurricular activities, C.C.'s grades have improved, and the children are in counseling. Notably, S.C. testified they "love[d]" their foster parent, who had "been a blessing to" the children.

Two families were interested in adopting both children, including one in the maternal aunt's neighborhood and one next door to the foster parent. The foster parent's neighbor, who was familiar with the children, provided respite care several times, assisted with facilitating sibling visits, adopted C.C.'s best friend, and was licensed to adopt. If adopted by the neighbor, the children would continue in the same school and have a continued relationship with their current foster parent. The foster parent testified the neighbor's property had a nice playground, a "GaGa pit", goats and chickens, and the families worked together and were "very passionate

about making sure that [C.C.] and [A.C.] have stability, consistency." She testified the family would allow sibling contact to continue, provide A.C. and C.C. a stable home, and meet the children's physical and emotional needs, which she stated was in their best interest.

Higgins testified S.C. had not demonstrated an ability to provide a safe environment and it was in the children's best interest to terminate her parental rights. Similarly, Dannaldson testified it was in the children's best interest that S.C.'s parental rights be terminated, as S.C. and J.C. demonstrated "over time that they are not willing to make the sacrifices needed to keep their children safe" or stop using drugs and had not demonstrated even a desire to do so. He testified S.C. and J.C. could not offer a stable home environment due to moving several times and having the children re-removed "for the same exact thing" after achieving reunification just months before, would not meet the children's emotional and physical needs, and, instead, posed an emotional or physical danger to the children. Dannaldson agreed that if S.C. retained parental rights she would continue to interfere in the children's lives, which had already shown to be detrimental to the children.

Moreover, Williams, testified termination and adoption was in the children's best interest based on S.C.'s and J.C.'s refusal to drug test, failure to cooperate, removal of the children without permission, and drug arrests. Similarly, Brown testified he supported termination, as the children needed a safe and stable environment, which S.C. and J.C. could not provide.

In contrast, S.C. testified she planned to attend Collin Community College to become a paralegal, started a nonprofit organization to promote legislative reform and help women in domestic violence situations, and held a toy drive last year. She testified it was in A.C.'s and C.C.'s best interest to return to her and J.C. and she claimed their current residence had space for the children, a big backyard, and was in the Palestine school district. However, S.C. admitted they had only lived in their current residence for a couple weeks and while she claimed they intended to stay long-term, J.C. testified to the opposite because he wanted something "more stable." Moreover, S.C. admitted she quit her job a month or two after the Department dismissed the 2018 case, she held a job for about three months at the end of 2020 but quit in January 2021, and she had not held a job since. The evidence further reflects their car was stolen, they sold their truck, and the vehicle they were driving when they were arrested the month before trial remained impounded.

16

Reviewing the evidence under the appropriate standards, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that termination of S.C.'s parental rights was in the children's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). Accordingly, we overrule S.C.'s tenth issue.

## RIGHT TO COUNSEL

In her first, second, third, and fourth issues, S.C. contends she was denied her right to appointed counsel and, as a result, denied due process.

S.C. submitted her application for a court-appointed attorney on September 4, 2020. Attorney Jeff Coe was appointed to represent S.C. on September 9. On September 18, the court substituted attorney Jeff Herrington for Mr. Coe. On January 12, 2021, Mr. Herrington filed a motion to withdraw, which was granted on January 21. On April 29, attorney Jonathon Storment filed a notice of appearance on behalf of S.C. On August 23, Mr. Storment filed a motion to withdraw. S.C. represented herself at the initial jury trial in February 2022.

On February 18, 2022, appellate counsel Colin D. McFall was appointed to represent S.C. On March 25, Mr. McFall filed a motion for new trial based, in part, on S.C.'s right to be represented by counsel. On May 31, said motion was heard and granted by the court and attorney Scott Nicholson was appointed to represent S.C. Mr. Nicholson represented S.C. thereafter and at the second jury trial in August. On October 11, S.C. declined the appointment of appellate counsel.

S.C. later raised the issue of her lack of appointed counsel to the trial court. The trial court remedied the error by granting a new trial and appointing new counsel. Because the trial court resolved the issue of which S.C. now complains, these four issues are moot and S.C. fails to demonstrate how she suffered harm as a result. *See Nat'l Collegiate Athletic Assoc. v. Jones*, 1 S.W.3d 83, 86 (Tex. 1999); TEX. R. APP. P. 44.1(a). We overrule S.C.'s first, second, third and fourth issues.

## REMAINING ISSUES

An appellate brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record. TEX. R. APP. P. 38.1(i). Although we are to liberally construe pro se briefs, pro se litigants are held to the same standards as licensed

attorneys and must comply with all applicable rules of procedure; otherwise, pro se litigants would have an unfair advantage over parties represented by counsel. *Muhammed v. Plains Pipeline, L.P.*, No. 12-16-00189-CV, 2017 WL 2665180, at *2 n.3 (Tex. App.—Tyler June 21, 2017, no pet.) (mem. op.); *Giddens v. Brooks*, 92 S.W.3d 878, 880-81 (Tex. App.—Beaumont 2002, pet. denied). Specifically, pro se litigants must comply with the rule requiring adequate briefing and citations to the record. *Redmond v. Kovar*, No. 09-17-00099-CV, 2018 WL 651272, at *2 (Tex. App.—Beaumont Feb. 1, 2018, no pet.) (mem. op.). Bare assertions of error, without argument or authority, waive error and present nothing for review on appeal. *McKellar v. Cervantes*, 367 S.W.3d 478, 484 n.5 (Tex. App.—Texarkana 2012, no pet.); *Washington v. Bank of N.Y.*, 362 S.W.3d 853, 854 (Tex. App.—Dallas 2012, no pet.). The appellate court has no duty to brief issues for an appellant, and if we were to do so, "we would be abandoning our role as neutral adjudicators and become an advocate for that party." *In re A.E.*, 580 S.W.3d 211, 219 (Tex. App.—Tyler 2019, pet. denied).

S.C. lists several other issues in her brief, including issues six, seven, and eight. These include purported challenges regarding conservatorship, ineffective assistance, an inappropriate transfer of the case, visitation, and administration of medication to the children. However, S.C. provides no record citations, legal authority, or analysis to support these issues. And the body of the brief never mentions or discusses these issues outside her "statement of issues." We have no duty to brief issues on S.C.'s behalf. We conclude that S.C.'s remaining issues are inadequately briefed and therefore waived. *See* Tex. R. App. P. 38.1(i); *Muhammed*, 2017 WL 2665180, at *2 n.3; *Redmond*, 2018 WL 651272, at *2; *McKellar*, 367 S.W.3d at 484 n.5; *Washington*, 362 S.W.3d at 854; *Giddens*, 92 S.W.3d at 880-81; *see Interest of I.G.*, No. 12-21-00068-CV, 2022 WL 175662, at *4 (Tex. App.—Tyler Jan. 19, 2022, pet. denied) (mem. op.).

## DISPOSITION

Having overruled S.C.'s first, second, third, fourth, fifth, ninth and tenth issues, overruled J.C.'s only issue, and concluded that S.C. waived her remaining issues, we ***affirm*** the trial court's judgment.

**BRIAN HOYLE**
Justice

Opinion delivered March 22, 2023.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

18



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**MARCH 22, 2023**

**NO. 12-22-00277-CV**

**IN THE INTEREST OF**
**A.M., A.C. & A.C., CHILDREN**

Appeal from the 369th District Court

of Anderson County, Texas (Tr.Ct.No. DCCV22-3393-369)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

Brian Hoyle, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*